**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ALTMEYER'S HOME STORES, INC., Defendant.**

Civ. A. No. 84–0853.

United States District Court,
W.D. Pennsylvania.

Oct. 20, 1987.

As Corrected Oct. 22, 1987.

Spencer H. Lewis, Jr., Issie L. Jenkins, Wanda Flowers, Ida Chen, E.E.O.C., Philadelphia, Pa., J. Alan Johnson, U.S. Atty., Chris Morkides, Pittsburgh, Pa., for plaintiff.

Dennis St. J. Mulvihill, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This action was brought by the Equal Employment Opportunity Commission ("EEOC") against the Altmeyer's Home Stores, Inc., a multiple retail store operator, charging it with lower pay to female employees below those paid to male employees in similar positions and failure to promote because of female sex. It was commenced in behalf of Terry Lee Plotner, manager, and Kathleen Marie Daley, assistant manager, of the defendant's store at Baden, Pennsylvania and females as a class.

The plaintiffs charge the defendant with violation of Section 6 of the FLSA, 29 U.S.C. §§ 206, 206(d)(1) and 706(f)(1) of Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. 2000e et seq. (1978 ed.) by discriminating between managers and assistant managers, but not between sales personnel, on the basis of sex in the payment of wages and promotions. The defendant denies the charges and in its defense asserts that all employees, male and female, were and are treated equally and in accordance with a method or system by which it always hired and promoted its employees in all its stores irrespective of sex.

This action was properly processed through and by the EEOC and this court has jurisdiction in the case.

As of the time of the cause of this action, the defendant owned and operated from eight to ten specialty retail home softgoods department stores in Pennsylvania and West Virginia. It classifies its stores as either "A" or "B" stores depending upon the size of the store, the amount and kind of inventory handled, as well as the character of knowledge and skills required by the manager of the specific store in that area.

At the time of the commencement of the charges, its main store, situated in New Kensington, Pennsylvania was considered an "A" store with another "A" store at Natrona Heights, Pennsylvania. Other stores at Baden, Uniontown, Butler, Morgantown, West Virginia, Vandergrift, Bridgeville and Southland were classified "B" stores. The Baden store, located in a small community, had a limited inventory of goods for sale requiring less knowledge and expertise on the part of the manager, assistant manager and other employees in the store. For instance, it was indicated that at the "A" stores draperies, for one thing, could be custom made for the convenience of customers. It required a manager with specific skills and knowledge to be able to provide custom-made draperies, and it needed persons acquainted with these skills to do so. The Baden store did not have such a service and did not need employees who had the skills which the managers of the "A" stores had.

It paid its managers and assistant managers variable amounts which consisted of a base pay and other additional premium and bonus amounts and occasionally reimbursement for expenses of moving and the like. It was obvious that no two managers and assistant managers received equal ultimate sums, except as a coincidental occurrence.

Prior to the initiation of this action, the manager of the Baden store, Terry Lee Plotner, had served the company at that store from May 9, 1980 to July 1, 1982. She claims that during her service as manager, she had increased the business of the store and had received praises from the company on several occasions. The defendant contradicted Plotner's statements and asserted that the store had become loosely managed; that food was eaten in the presence of customers; that the place was not neat or kept in orderly fashion; and that business began to decline.

The defendant was contemplating and preparing the opening of a new large "A" store in Monroeville, Pennsylvania, an extensive business community with heavy traffic. Plotner asserted that she had ambitions to become promoted to the position of manager in the Monroeville store when it opened and that she had let a number of supervisory individuals know of her desire, but that she was not considered for that job because she was a woman.

Thus, while there was a difference of thinking on the part of the plaintiff and the defendant, the real cause of differences between the defendant and Plotner came to a head when one morning the safe at the Baden store had been found unlocked and $800 missing. Plotner admits that the safe had been left unlocked and that it was a violation of the rule of the company which provided for the managerial assurance of security of the funds of the company. The police were called and Plotner submitted to a lie detector test. While defense counsel attempted to introduce evidence, not of results of the lie detector test, but of circumstances related to the test, I deemed it inappropriate that the results of the lie detector test or any evidence relating to the pretest interview, statements to the polygraph consultant, or observations by the polygraph consultant be admitted into evidence. Any evidence obtained through use of a lie detector test should be inadmissible, therefore, I disregard it.

Plotner asserted that as a result the company was accusing her of "stealing" and she quit. She thereupon made application for unemployment compensation, but her claim was denied. She did not appeal. Other than her own statement that the defendant was accusing her of embezzlement, there is little, if any, evidence to prove such an accusation. I find as a fact, also that, lacking her burden of producing preponderant evidence that she was dismissed, that she was not dismissed.

Plotner testified that she lived in Industry, Pennsylvania, a small town outside of Baden where she was employed; that she was married and had 2 children; that she and her husband owned their home in Industry; that she would not move from her home if the defendant were to have given her the manager job in the new store in Monroeville when it opened; that she had constantly reminded management officials that she was interested in obtaining the Monroeville job; that if given the Monroeville job, she would commute from Industry the 57 miles each way to and from work and that she would do this in approximately an hour in each direction; but that she was not considered for the job in Monroeville because she was a women.

After she left, the defendant transferred Ron Hall from the Natrona Heights store to act as manager of the Baden store. He was there on a temporary basis, but his position was made permanent as manager on July 8, 1982.

As for Daley, a case in her behalf does not exist because she neither testified, nor did anyone testify in her behalf to support the charges made by the plaintiff EEOC, against the defendant. She was hired by the defendant, Altmeyers, as an assistant manager at the Baden store in August, 1980 and was employed there until July, 1982. She came to the Baden store with five years experience, including managerial

experience. One witness said that Daley was terminated by the Personnel Manager, Mrs. Altmeyer, after a long discussion; and after such termination, she was heard to say that she would get even with the bitch. No evidence was presented as to whether or not she made application for workers's compensation thereafter. No evidence was presented by the plaintiff for any reasons for the altercation and firing. Since no evidence was presented in her behalf, the plaintiff failed to make a case that she was the object of sex discrimination by the defendant, according to the charge she made to the EEOC. The plaintiff has since withdrawn its claim for Daley.

One of the defendant's defense theories is here an important factor in fact and law. It claims that it never differed between male and female employees or violated the discrimination Acts. It maintains that it was always concerned with promoting those who demonstrated skills and in rewarding those employees with higher paid positions such as assistant manager and manager of stores. For instance, it would take an assistant manager in an "A" store and fit him or her in as a manager in a "B" store where circumstances called for such a promotion or change. It would promote "B" store managers to "A" store assistant managers where fitting also. It promoted "A" store managers when and where fitting and desirable as a matter of business practice. Its concern was always with the fitting of the employee into the position calling for one with his or her capability, knowledge and skill, and that it favored and endeavored to fit the employee into the place where such qualifications were most suitable and efficient.

This action was brought by the plaintiff and processed pursuant to Sections 16(c) and 17, 29 U.S.C. Sections 216(c) and 217 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. Section 201 et seq., refered to as the "FLSA," to enforce the equal pay requirements in Section 6(d) of the FLSA, 29 U.S.C. Section 206(d) and pursuant to Section 706(f)(1) of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. Section 2000e et seq. (1978 ed.) as it is referred to as Title VII.

Both statutes form the basis for its reliance for a remedy for the claims which it makes in its complaint. Both statutes must be processable through the EEOC. That was properly done here.

The equal pay statute was enacted by Congress after a long time abuse of women in the work place. It is in line with these other similar corrective statutes for the improvement of the common lot of discriminated against persons, as it takes its place with the various civil rights actions for the protection of those who are of a particular race, religion or creed, those who are of a certain age, and those females who now in the view of the American public are believed to be taking a place in commerce, industry and the professions as equally as can and do men. It is Congress' view that this can be done by means of statutory help because of the similarity in actions and procedure and because proof in all these cases are more or less basically comparable.

The proof, the order of presentation, the burden and the defense in discriminating treatment cases are more or less alike. The processing in court has been set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination; second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection . . ."; and third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons but a pretext for discrimination. *Id.*, at 802, 93 S.Ct. at 1824.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Board of Trustees of Keene State College v. Sweeney*, 439

U.S. 24, 25, n. 2, 99 S.Ct. 295, 297 n. 2, 58 L.Ed.2d 216 (1978). It is the McDonnell Douglas ruling of intermediate evidentiary burdens which serve to bring the litigants and the court expeditiously and fairly to the ultimate question for judicial determination.

Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent on the fact of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

The burden which shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason. The defendant need not pursuade the court that it was actually motivated by the pro-offered reason. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the individual's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant, thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

In this case, it is alleged that a commercial firm has mistreated women in paying them less compensation than men and in failing to promote them on an equal basis with men. It is incumbent, therefore, upon the plaintiff, the EEOC, to come forward and produce evidence which will bring it within the requirements of the statutes upon which they rely for a remedy. The burden is upon the plaintiff to produce sufficient evidence by a preponderance thereof to influence this court that the Act or Acts have been violated and that remedial action by this court is needed.

Thus, the evidence in the case before me, as presented by the plaintiff, the EEOC, attempts to show that (1) a female store manager, Plotner, at the Baden store was discharged after being accused of embezzling funds from the defendant, her company employer; and (2) that she was rejected and refused a promotional position in a store being newly established and to be known as an "A" store in Monroeville, Pennsylvania. The second claim by the plaintiff is that the assistant manager at the Baden store was discharged without reason and the third claim was that other classified female employees since the time of the dismissal of Plotner and Daly have been discriminated against in the amount of pay given them and in promotions.

As previously stated, the defendant denies all this and asserts that the method of selecting and hiring of employees is in accordance with the plan within the procedure and scheme upon which the company runs its business irrespective of sex. The defendant adds another contention when it asserts that each store is a separate retail establishment pursuant to the wording of the Equal Pay Act and that, therefore, the government may not base discrimination in payment of wages by comparing Plotner, Daly and others with employees of other stores, establishments. The defendant claims that there is no Title VII jurisdiction because it never employed more than 15 employees in the Baden store. This would give it a classification of "separate establishment" which under the Act would result in a lack of jurisdiction by this court.

The plaintiff presented several employees of the defendant as some of its witnesses, in addition to the two claimants, an expert, and its own accountant. The defendant presented its top personnel official, several of its employees and an expert witness. These were the primary witnesses.

From all the evidence before me, I find that: the defendant, Altmeyer, was as of the time in question the owner and operator of from eight to ten stores in and about the Pittsburgh area; that three of the large stores were classified as "A" stores in New Kensington, Natrona Heights and Monroeville; that the other small stores were classified as "B" stores and were situated in Baden, Bridgeville, Butler, Southland, Uniontown, Vandergrift and Morgantown, West Virginia; that the Monroeville store was in the process of being established in 1981 at the time when the difficulty or misunderstanding, or whatever it may have been, arose between Plotner and her employer; and that the stipulation of the parties agree upon the amount of business which was done at each of the defendant's stores from 1980 to 1985 and suggests a wide variety of results which do not indicate to me how many male or female managers or assistant managers would have been responsible for those specific results.

As relating to Baden, Plotner asserted that she increased the volume of sales but he testimony of Ronald Hall for the defendant asserts that the sales had been diminishing and increased after a new manager succeeded Plotner. This evidence would indicate that both could be correct. Since no sales records were introduced into evidence by either the plaintiff or defendant for the pertinent times in question, there is no way for me to ascertain exactly what these sales were in those periods of time.

As for the amount of business that was done at the Baden store, there is a variance from 332,141 in 1980 up to 452, 649 in 1983 and 416,022 in 1984 down to 392,137 in 1985. Thus, with what oral evidence was presented before me that the plaintiff Plotner increased or decreased the sales, I have actually no supporting evidence, and except for her own, that was not sufficient to prove to me her contention by the preponderance of the evidence as a whole.

■ The main argument made by the plaintiff for Plotner is that she was discriminated against as a female because the company did not consider her as a manager for the new large store in Monroeville and that she was not even asked if she wanted it; that it ignored the fact that she informed various supervisory employees that she wanted the job of manager when it would open in Monroeville; and that she could travel 57 or 58 miles over highly traveled roads between Baden and Monroeville in one hour. When a case is tried to a court, it is incumbent upon the presiding judge to act both as judge and jury in guiding himself or herself in the processing of the case according to the principles which might be laid down to a jury in observing witnesses. So it is incumbent upon me to carefully examine and reexamine the witnesses to determine their credibility. As this relates to Plotner, her credibility is faulty by reason of the inconsistencies which she presented in her case. I observed her attitude when it came to her family and was convinced that she was not about to abandon her husband and children to such an extent as would deprive them of so many hours, for each of the days in a week, from early morning when she left home for opening time in Monroeville and from closing time in Monroeville until she got home—if she were to take the Monroeville position. Although she said she could travel the 57 miles over the heavy trafficked roads between Baden and Monroeville in one hour, I consider this to be an impossibility. Because I am personally knowledgeable with all the area involved, I take judicial notice of the fact that the Baden area from Beaver Valley into Allegheny County over the two or three routes which exist to Monroeville are always heavily laden with traffic moving in all directions. I know and take judicial notice of the fact that the highways, some of which consist of the parkway, east and west, into Pittsburgh and the highway especially into and through Monroeville are in constantly crowded vehicular areas; and that averaged space of travel such as that could not possibly be made by automobile between Baden and Monroeville in the time period of one hour. I shall not suggest the time that it would take to travel from Baden to Monroeville and return, unless by plane or helicopter, which was not suggest-

ed, certainly is more in line with that provided by a defedant witness who checked two routes and said it would take at least one hour and twenty minutes to travel one way.

Plotner also indicated that she would not give up her home in Industry, Pennsylvania and I can easily assume that she would not give up her family for the probable time of not less than 12 hours each day away from them—unless she assigned some of that time to the assistant manager. Therefore, I am impelled to believe that she would not have so easily taken a job at the Monroeville store even if the defendant had made a glittering offer to her. As for her indicating she wanted the position and telling certain fellow employees in supervision, that is a far cry from making a formal request to Mr. and Mrs. Altmeyer, the owners. Although she said she asked them for the position, there is no corroboration of fact in this matter, and I do not accept her statement. Additionally, I am not impressed by her credibility because of the ease and speed in which she quit when no finger was actually pointed at her for embezzling or stealing, but because of what she said she felt or believed that they were suspicious of her.

I find as a fact that there was no discrimination as far as the hiring for the Monroeville job was concerned. As for the discrimination in pay, I shall discuss that presently.

There was and is no evidence here that Plotner was discriminated against when the Monroeville store was being opened and when a male, Henry Kozolup, was hired to manage the new Monroeville store in July 1980 and Sherman Shiflet was hired to manage the Monroeville store in February 1981. Both men were hired from the outside. Shiflet continued to manage the store from his time of hire until June 12, 1984. These two, it had been shown had years of experience with other employers and were skilled in the handling of inventory such as that which was sold or supplied at the Monroeville store.

While the time period from which the charges evolved was during the dates when Plotner and Daley served in the years from 1980 to 1982, the plaintiff projects the discrimination charges into later years and asserts that the defendant had only begun to recognize the discrimination acts after the filing of this action on June 28, 1982. The EEOC in its attack upon the defendant must of necessity and does raise the question which forms the main issue—has the defendant been in violation of the Equal Pay Act and/or Title VII of the Civil Rights Act in accommodating, adjusting and influencing its dealings with certain of its employees because of sex.

It is noteworthy that the plaintiff called as its witnesses, Patti Shirey and Ronald Hall, who were employees of the defendant; and while it was not indicated that they were calling them as for "cross-examination," I recognized that there could be antipathy by the defendant's witnesses for counsel in questioning, and so wide latitude was permitted plaintiffs' counsel.

The plaintiffs' witness, Hall particularly, indicated that the merchandise in Baden was in disarray, was in bad shape, unorganized and that the storeroom and office were in a mess. Food and bottled goods were consumed on the premises in front of customers and the staff were not alert. The evidence further indicated that Hall reorganized both the store and its personnel and from that time on business began to increase. I find from the financial report that it was likely that as a manager, Plotner, did increase the business, but it seems that as time went on, business began to deteriorate, and that when Hall revamped the store that business again began to increase.

Expert opinion evidence was presented by each to persuade me that in the case of the plaintiff intentional mistreatment of females by way of less pay and less promotions occurred; while in the case of the defendant, no such intention or activity on the part of the defendant existed.

The plaintiff presented Donald Schwartz an industrial psychologist in rebuttal. He had a Bachelor of Psychology Degree, a Masters Degree and a Doctorate in Psychology. He was employed by the plain-

tiff, the EEOC, and functioned in its research and analytic service division. He worked for the County of Los Angeles from 1960 to 1969; he was with the Civil Service Commission of the United States from 1970 to 1976; he was with the United States Department of Labor from 1976 to 1979 and he has been with the EEOC from 1979 to the present time. He was also a teacher at the University of West Virginia and had sufficient qualifications in labor relations to enable me to declare him to be an expert in that field.

Beginning in 1986, he visited four of the defendant's stores: New Kensington, Natrona Heights, Baden and Butler. He observed the individuals at the stores, working conditions and the jobt duties of each individual. He did not talk to the individuals, he only observed them, and this he reported back to the management.

Since the issue in this case is on the charge by the plaintiff that the employment was based on sex discrimination, I found nothing in any of his testimony which gave me information on that issue. I considered the shortness of time for his application of attention to the stores and observance of employees and employers and their activities and I concluded that expert though he was, he did not obtain sufficient substance and content upon which to base and from which to form the opinion which he presented in evidence as being credible. As for his statements or inferences that the big stores and the little stores were all doing the same work and entitled to similar pay, I find this to be in conflict with the actual testimony in the case as I shall relate it.

The defendant's expert witness was Hyman Richman. His background was impressive. He was a Labor Standards Consultant with a background in personnel practices and a teacher at the University of Pittsburgh, he was a labor mediator settling all aspects of the collective bargaining process for the Commonwealth of Pennsylvania for 13 years; as a teacher at the University of Pittsburgh, he had 33 years at the graduate level; he also had 12 years at the graduate level of Public and International Affairs; he taught at Pennsylvania State University and set up the curriculum in Labor Relations and Personnel; he had a Bachelor of Arts Degree and a Masters Degree from the University of Pittsburgh; he worked for a long time with the United States Department of Labor and was directly involved with the Fair Labor Standards Act and the Equal Pay Act and their enforcement; he supervised a staff of 15 enforcement agents; and he left in 1974 after having helped to draft the regulations interpreting the Equal Pay Act.

This expert too was impressive in his qualifications and I declared him to be an expert witness in the labor field. But since the issue in this case is on the charge of the plaintiff that the employment was based on sex discrimination, I found nothing in any of his testimony which gave me any information on that issue. As for his statements or inferences that the big stores and the little stores were all doing the same work and entitled to similar pay, I find this to be baseless and in conflict with the actual testimony in the case as I shall relate it.

In both instances of the plaintiff and defendant presenting expert witnesses, I suggested to opposing counsel that they cross-examine on qualifications before I made such declarations, but nothing was produced in cross-examination which interferred with my conclusions on the specific expertise of each of these witnesses.

The defendant asserts that "A" stores had large volumes of business, had multiferous kinds of merchandise and that some of the merchandise required experts. The main item of stock which required special expert individuals was in the custom drapery department. This did not mean that all stores could not have draperies, but when it came to selling custom-made draperies, all the salesmen could do in lessor stores was to take dimensions and help the customer choose a particular cloth and pattern for the draperies which were shown in catalogues. Draperies were then made to exact specifications for each customer and for that customer's purpose.

The defendant's defense also rests upon its denial that 1) it violated the Equal Pay and Title VII Acts and 2) that each of its stores are not distinguished as separate "establishments." It is the defendant which contends that each of the Altmeyer's stores should be treated as separate establishments for Equal Pay Act circumstances, thereby precluding comparisons between female employees at one store and similarly situated male employees at other stores. Section 6 of the Fair Labor Standards Act of 1938, as amended, provides, in part, that "(n)o employer having employees subject to any provisions of this section shall discriminate, *within any* establishment...."

The defendant argues that the Court in *Brennan v. Goose Creek Consolidated Ind. School District*, 5 EPD 8621 (D.C.Tx 1973), aff., 519 F.2d 53 (5th Cir.1975) recognized that there may be situations in which a single establishment could include operating at more than one physical location. *Id.* at 56. Here it was held that a single school could consist of a single establishment. Judge Weber, in *Wetzel v. Liberty Mutual Insurance Company*, 449 F.Supp. 397 (W.D.Pa.1978) applied the test espoused by Judge Gee rather than limit his interpretation of "establishment" to distinct physical places of business. Judge Weber held that 130 physically separate branch offices were separate establishments, nevertheless, that the defendant insurance company had violated Title VII and the Equal Pay Act by paying male claims adjusters more than female claims representatives for performing equal work. It is noticeable that Judge Weber held that the "single establishment" requirement of the Equal Pay Act does not apply to equal pay violations under Title VII. *Id.* at 407.

■ The term "single establishment" is significantly picturesque. The very words are indicative of separation, of separate identities, of separate ideas, of physically individual, separate and apart objects or institutions. The evidence in this case shows that the defendant was active as a single unit, an incorporated entity; that it maintained its headquarters in New Kens-

ington, Pennsylvania, and that it maintained storerooms as outlets in places where its goods were shipped to each of the stores as required; that it maintained one payroll for all of its employees in all of the stores; that it provided one set of rules for the conduct of all the stores as a matter of uniform policy; that it also applied the same governing rules for pay for the employees of all the stores, with the exception of the larger "A" stores which were on a different basis than Baden as was Monroeville and New Kensington; that Monroeville was considered a very large store; that it sold furnishings, such as bedding, towels, and other cloth material used in the home; that its customers consisted primarily of owners of organizations such as motels which were large purchasers; that it maintained more of certain kinds of goods in one store than in another depending upon the consumption of goods in an area; that it sold carpeting in one of its stores, again depending upon the demand in that area; that it sold draperies in all its stores, with the exception of New Kensington where they were custom-made according to the customers wishes; that each store contained more or less of a variety of merchandise than others and that the stores were stocked differently.

Mrs. Altmeyer, the Personnel Manager, was and is the authority over various personnel in each of the stores. Transfers or promotions of employees are made between stores and the pay of all the employees comes from the main office. Accordingly, the defendant's contention that each store is a separate establishment falls of its own weight.

From all the evidence presented, I am persuaded that each store differed from the other; that the duties of the managers, assistant managers and employees, generally, differed from store to store, and that the knowledge of particular inventories varied from store to store. It would appear that in order to be a manager, one had to be familiar with the vast bulk of the requirements of that particular store and while familiarity with other stores was helpful, it was often necessary, as the defendant testified, to have new managers

coached and trained and sometimes required additional help to acclimate them to their duties as managers in the new stores.

With so many variations, as each of these stores presented, it was necessary for management to make each manager of each store capable of functioning in the position of a particular store in order to become or be its new manager. As for an assistant manager, there was no necessity for the defendant to be choosey so long as the manager was a reliable administrator.

In the examination of all of the evidence presented as a whole by the plaintiff alone, I find very little with one exception which persuades me that the defendant intentionally discriminated against anyone of its female employees from 1980 forward. It is notable also that before this action was brought and in years subsequent to the entry of the case by the EEOC that only two complaints were made by female employees of the defendant, those here, the ones who filed the objections, Plotner and Daley; that practically all of the evidence, pro and con, presented by the plaintiff which it hoped to have support for its contention came from employees of the defendant; that even Plotner failed to show that she was not accepted by the defendant for the Monroeville store or that she was discriminated in pay as a matter of unequal compensation with all the other managers of the "B" stores.

As for the defendant, its evidence far exceeds any amount or weight necessary to counteract that presented by the plaintiff when it showed that it had up to 10 stores located in diverse areas; that the stores differed in two configurations of "A" and "B" stores; that the "A" stores were large, well inventoried and with general and some custom home supplies, skilled managers able to perform certain functions which the "B" store managers were not required to perform, consisting of both males and females. Reliance was had mainly upon managers of stores because they were vested with considerable discretionary authority. It was their responsibility to select sales people and to manage them within the fixed rules of the company.

They were not directed to hire males or females in preference one to the other. They had considerable leeway in making a successful retail outlet establishment for their employer. They were entrusted with the responsibility for the inventory and for the cash which the inventory brought in. They were required to know the inventory and oversee the employees under them in the handling of the business of the company. In some stores, special skills and experience were a necessary part of the performance of the managers and not all managers were necessarily on the same level as to be equal in employment requiring equal pay for all. The overseeing of all managers was the Personnel Officer, Mrs. Altmeyer, where the promotions, hiring and firing authority lay.

The defendant undertook to show that it had eight or ten stores set up in different cities based upon population and character of the communities; that some of these were larger stores and some were smaller, none appeared to be exactly equal; that the management and assistant management of each varied to a large extent and that it attempted to provide smooth business practices which would regulate all employees fairly and within the consideration of sex.

All of the employees, except one, Wineman, who served on a special contract basis, served in various grades of employment. There were managers, one for each store, assistant managers, one for each store under the manager, and underneath these served the sales people, both male and female. The plaintiff, the EEOC, made no complaint that the defendant did not treat the sales people, male and female, in violation of the sex discrimination Acts. Its complaint is only with the two upper classes, managers and assistant managers. It could be argued, and the question may well be asked, if the plaintiff paid unequal wages to women mangers and assistant managers, why would management not have misapplied the Equal Pay and Fair Labor Standards Acts to the male and female clerks in stores generally? Why, too, it may well be asked in a merchantile establishment such as that of the defendants, would the defendant self-destructively rele-

gate an individual to an inferior position because that would be manager or assistant manager happened to be a female if that female in a manager or assistant manager's position could make more profit for the company?

These questions haunt the entire presentation of the case by the plaintiff, particularly when the one and only chief official responsible for these accusations is a woman, Mrs. Altmeyer. It may well be that a woman might hold a spite or grudge or some psychological malice against women or even against a woman manager or assistant manager, but if that were the case, the plaintiff showed no evidence of such kind or any antagonism whatever against a woman or women in general. I, therefore, hold that Mrs. Altmeyer's and the defendant's conduct toward male and female managers and assistant managers was, as in the case of employees in general, devoid of any action in its business dealings which showed any sex discrimination. These questions arise only in the research of the evidence to find the intent which the plaintiff charges the defendant with using discrimination between the male and female managers and assistant manager employees only.

As for credibility, although Plotner asserted that she had constantly evinced oral information to officials of the company of her interest in managing the new Monroeville store, which was to open in the future, and that she had performed so well as the manager of the Baden store as to produce increases in business, the defendant contradicts these assertions. It contends that she was criticized in her management skills from February to July, 1982 and also because of her difficulty with people and in her exercise of judgment. This was attributed to her attitude and the morale within the store. She was criticized by letter dated December 22, 1981 by Rod Altmeyer, the president, for poor management, bad housekeeping and merchandise display and for improper lighting.

She was charged with not finishing displays, and the decline of sales in the Baden store beginning in March, 1982 and continuing until Plotner resigned. The evidence indicated that no one accused her of theft of money from the store, but that it was her own thinking, or perhaps conscience, which brought that evidence into the case. She was criticized for failing to deposit in the bank the $800 which was missing one morning when the safe was left unlocked and which she admitted was in violation of the regulations of the company.

It was indicated that the regulations required that one who was interested in or aspired to an open higher position, set forth such interest on a special form provided by the company. Even her allegations that she orally expressed interest in managing the Monroeville store to other employees of the company was not set forth with such vehemence as to indicate to me a real desire to become the manager of a store which was 58 miles away in a crowded, heavily trafficked area and to abandon a husband, a home and children for the many hours it would be required of her in serving as a manager in a large "A" store as contemplated for Monroeville. I was not impressed that her credibility, after the facts, was substantial and entitled to be given any weight and I do not do so.

The plaintiff urged a finding to the effect that four pairs of employees were examples of the misapplication of the Equal Pay Act and Title VII of the Civil Rights Act to emphasize the disparity in wages paid from 1982 to 1986, between male and female employees. The plaintiff places them in pairs of male and female hypothetically in the same store.

Through the testimony of defense witness, Walter Swesky, it was shown that male managers succeeding female managers were at least on two occasions paid less than their predecessor female managers at the same store. It was testified also that this salary differential was due to experience. Mr. Romeo who succeeded Shirey as manager of the Monroeville store was paid less than Shirey. Greg Staub, manager of the Morgantown store, was paid less initially than Jean Baldwin, the female manager who preceeded him.

While there are three areas of employees, managers, assistant managers and one special employee contractor, it is incumbant upon me to classify the managers and the assistant managers for the purpose of making comparisons or contrasts in the payments made them by the defendant. While no one has stated that the particular individuals were male or female, I have assumed that they were such from their female or male names and from the general testimony as it was presented on the whole. In that way, I can discuss and give consideration to the method by which the plaintiff has presented four pairs of employees in an effort to prove the contrasts in pay for which the defendant is responsible because of discrimination, if any.

Judy Kimicata, a female, received $576.92 commencing in 1982 and through the pay period in 1986 the sum of $638.35. A contrast is made with Jacob Wineman who received the sum of $692.31 from 1982 throughout 1986. This is an improper contrast or comparison because Wineman worked on a special contractual basis irrespective of the position which he held. Neither Kimicata or any other employee had such a contract.

The defendant presented Jacob Wineman as a witness, who worked during the years 1981 and 1982 and had come to the defendant with special qualifications. He had 25 years experience in the retail business; he had worked for a department store in Pittsburgh before and he was an expert in real estate matters. It was the defendant's thinking that this individual might be able to take over some of the management functions and lighten the load of the officers of the company, while at the same time, he might be able to become familiar with their real estate holdings as well and handle some of these.

■ Wineman and the defendant's representatives entered into a contract and arrived at the initial unusually large pay which Wineman was to receive and did receive for a period of time, and also further understanding of increases as he took over additional functions. He started with the defendant at the sum of $23,000. However, toward the close of his employment his salary fell precipitously. There is no evidence that any manager or assistant manager commenced or started at an amount as high as that paid to Wineman. As time went on, it seemed his services or functions were not what the defendant thought they might be, and when he left the defendant's employ, he was earning only $18.000. Accordingly, I find that Wineman is not a proper individual employee who can be used for the purpose of proving disparity in pay between any males and females, let alone between himself and July Kimicata.

This matter of bargaining with Wineman supports the defendant in its contentions that all employees in their various employment positions whether at "A" stores or "B" stores were singularly evaluated for their services and as they fitted into those services for the particular store or places in which they served.

■ The plaintiff's comparison between Plotner and Ronald Hall shows no similarity. Hall was hired as a manager with much more experience than Plotner because he came to the defendant in 1980 after having worked at a Thrift Drug Store in Pittsburgh and as a clerk at a Giant Eagle store. He worked part-time as a warehouse person in Altmeyer's New Kensington store; he worked as a manager trainee at the Attic, a bargain store; and he then became assistant manager in 1980 at Altmeyer's Natrona Heights "A" store. In 1981, he became acting manager at the Baden store; and in July, 1982, he became manager of the Baden store, where the store was in bad shape and unorganized. The evidence was that Hall reorganized both the store and its personnel and from that time on, business began to increase. Although the Baden store is used as the factor for the showing of disparity, the time element and circumstances involved between the time Plotner was employed and Hall was employed are so wide that it is unfair to match them or contrast them on wages. The facts are too much in disparity to make any comparison between Plotner and Hall to give the plaintiff any

strength in its charge that pay was unequal between these two.

■ The plaintiff made another comparison between the salaries of Gregory Staub and Anita Ford at Morgantown. Comparisons contained in plaintiffs' Exhibit 39A were based on "starting or base salary, any overrides, bonuses and commissions." Plaintiff alleged that Anita Ford is owed $692.31 in back pay due to a sex-based wage disparity. Gregory Staub was manager of the Morgantown store until May, 1982. Prior to his management of that store, he was assistant manager in the Monroeville Class "A" store. His beginning salary as manager was less than the salary received by his female predecessor Jean Baldwin who was paid $5.00 per hour during the entire time she was manager of the Morgantown store. After a probationary period, Greg Staub was raised to $5.00 per hour and his ending salary was $5.00 per hour while working a 40 hour week.

When Anita Ford started as manager of the Morgantown store in May, 1982, she received less than $5.00 per hour. After a five or six month period during which she assumed additional responsibilities, her salary was raised to $5.00 per hour. Ford did not work a regular 40 hour week because she attended classes at West Virginia University part time. There can be no comparison between one who worked full time and one who worked part time. Whether they were male or female makes no difference. The basis for the comparison is lacking. In any event, the evidence shows that this female at times received more pay than a male counterpart. It also shows too much of an up and down in different directions while employed so that they could be fixed in one place and level for comparison.

■ The plaintiff does make a showing in the fourth comparison in the case of the pay paid to Patti Shirey and Sherman Shiflet. Commencing in 1984, Shirey received the sum of $580.27 and in 1985 through February 22, 1986, the sum of $576.94, and on March 8, 1986, the sum of $634.62. These figures included base salary and bonus, commission and overrides. But Shirey received no commission or overrides, only

one $40 bonus in the period from July 14, 1984 to December 15, 1984. The male counterpart presented by the plaintiff to show discrimination between these two was Shiflet. He received the sum of $769.24 every two weeks beginning 2–2–81 through 6–12–84. He received no commission or override. Thus, there is clear evidence of a contrast in pay between these two individuals which should be rectified and which could be considered by this court as a violation of the Equal Pay Act.

It is equally incumbent upon an employer after a prima facie case has been proven to show that where a difference occurs in pay between the sexes or in privileges that the difference is a bona fide use of other factors than sex. *Washington County v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). This is especially true here because the defendant presented no rebuttal evidence.

I must determine whether the Equal Pay Act applies to the circumstances of this case by a preponderance of evidence when presented in the first instance by the plaintiff upon whom it is incumbent to show that the work was equal work and entitled to be equally paid without any discrimination because of sex.

■ The Equal Pay Act and the Fair Labor Standards Act are remedial statutes and should be liberally construed in favor of their intended beneficiaries. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (1976), 185 U.S.App.D.C. 322, cert. den. 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), on remand 481 (DC Dist Col), F.Supp. 199, (D.D.C.1979), *Grumbine v. U.S.*, 586 F.Supp. 1144 (D.D.C.1984).

■ It is the matter of sex and the treatment of females which is the concern of the labor and fair pay statutes; but the violation of these will not be made unless the factor of sex provides a part of the basis for wage or treatment differential. *Brennan v. Sears, Roebuck & Co.*, 410 F.Supp. 84 (D.Iowa 1976). However, in addition to the factor of sex, in order to make a claim in court in an equal pay action, the plaintiff must demonstrate that the jobs in question

require equal work, effort, skill and responsibility, as well as, performance under similar working conditions. *McKee v. McDonnell Douglas Technical Services Co., Inc.,* 700 F.2d 260 (5th Cir.1983) reh. den. 705 F.2d 776 (5th Cir.1983).

Congress in enacting the Equal Pay Acts did not intend that the words equal work be identical one to another, but only that they be substantially equal so far as performance is required relating to skill, effort, responsibility and working conditions. *Odomes v. Nucare, Inc.,* 653 F.2d 246 (6th Cir.1981).

■ In making a determination of whether the Equal Pay Act applies to the circumstances of this case, it is incumbent upon the plaintiff to show not that the work was identical as being equal work for equal pay, but merely that it was substantially equal and was justified only as it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities. *Thompson v. Sawyer,* 219 U.S.App.D.C. 393, 678 F.2d 257 (1982).

■ Therefore, it is incumbent upon the plaintiff to make out a violation of the Equal Pay Act by showing that the jobs were substantially equal. *Spaulding v. University of Washington,* 740 F.2d 686 (9th Cir.1984), cert. den. 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). Again, it is necessary that for the purposes of equality under the Equal Pay Act to state that job content is controlling. The test is not identical, but substantial equality and mechanical and surface similarities are inadequate to establish equality of two positions where sex discrimination is alleged. *Angelo v. Bacharach Instrument Co.,* 555 F.2d 1164 (3rd Cir.1977). Experience, training and ability required in a job must be considered in determining whether jobs require substantially equal skill under the Equal Pay Act. *Horner v. Mary Institute,* 613 F.2d 706 (8th Cir.1980). The plaintiff has here met the required burden in the case of unequal pay to Shirey.

■ Although the plaintiff has titled the alleged discrimination against female workers as managers and assistant managers, it is not the title to which we must look, but rather to the content and to the other factors which concern them such as merit and merit systems, quantity and quality of work and responsibilities and competencies as a factor other than sex. Since job duties and job skills as well as job requirements vary so widely, provisions of the Equal Pay Act must be applied on a case by case basis. *EEOC v. Mercy Hospital and Medical Center,* 709 F.2d 1195 (7th Cir.1983). Not only must these principles be applied on a case by case basis, but the several factors within a case must be determined on a factor or set of circumstances, basis from the other factors or set of circumstances, in the case. That is why the Shirey and Shifflet factor or set of circumstances stand out from all the rest of the factors or sets of circumstances presented by the plaintiff, particularly in the four complete couples—and show lessor pay to Shirey than to a male under similar circumstances.

■ The Equal Pay Act does not prohibit employers from making salary distinctions based upon bonafide and basic plans or systems where merit, performance and results achieved are its concerns, and not sex discrimination. *Saltzman v. Fullerton Metals Co.,* 661 F.2d 647 (7th Cir.1981), on remand 568 F.Supp. 47 (N.D.Ill.1983). It is these principles of law which I here seek to apply to the proven facts of the case and which I have researched and find from all the evidence in the case as a whole by a preponderance thereof.

In a case such as this, it is not difficult to understand that job duties and job skills as well as other requirements vary from store to store so that the provisions of the Equal Pay Act must be applied on a case by case basis. *EEOC v. Mercy Hospital and Medical Center, Supra.* It would indeed be a difficult task for an employer as well as a harsh to force it, him or her to make all the jobs equal or to base them upon equalized standards in every instance of human endeavor whether in commerce, industry, science or professional areas. From what appears as undisputed facts,

the defendant conducted a business furnishing and supplying interior necessities used in homes, motels and other places of abode for the purpose of providing a distribution of these items through adequate and convenient outlets to those who desire and need the defendant's commodities. The defendant maintains from eight to ten stores in communities of various sizes, population and character and outfits them with inventories suitable to the needs and the purchasing capabilities of the customers. Some communities produce customers which demand a wider variety of products than others. Some communities are more financially able to afford costlier goods such as custom-made draperies or carpeting and other comparable home furnishings than other customers. Some communities have motels which the defendant serves as its customers. With a variety of this kind from place to place, the defendant provided large stores such as "A" stores and smaller stores such as "B" stores and supplies inventories suitable to the community in which each store is situated. Each store, then, requires the supervision of a knowledgeable and expert person as manager different from place to place and very frequently requires coaching or training to insure skills adequate to a particular store whenever a promotion or change occurs from one store to another or from an assistant manager to manager. Thus, it is the character of the business and the need for trained personnel to supervise the business of each store which requires, as the defendant said and I believe, careful and skillful selection of managing personnel by the defendant for the position. As already stated, it would seem foolish and unreasonable for a merchantile establishment of this kind to discriminate between a capable female in favor of an incapable male.

While the facts of the case are such as to indicate that there could be a leveling of all employees, male and female, so as to show that the very selection of a female or male out of the class would be an act of discrimination, it is hardly likely that such an ideal set of facts could be arrived at very easily. But I cannot conclude that such an ideal situation exists in this action because of the many dissimilarities in regions and character of businesses conducted in those regions especially with possible competition of other similar businesses and mail order companies distribute similar goods and make it necessary for an ideal processing such as the defendant has succeeded in creating and operating.

Congress in the enactment of the Fair Labor Standards Act did not intend to wreck human endeavors, but only to equalize the opportunities as they should exist between equal competitors in an open and free market. Probably one of the most competitive human endeavors is in matters of business and particularly in the sale of commodities or other things capbable of being valued and not in the matters of employment. Congress did not intend that the Equal Pay Act should be applied to discriminate against employers, either. The Congressional equal pay and treatment statutes are so structured as to permit ratings of employees to be established in a bonafide job rating system where it does not discriminate on the basis of sex. *Washington County v. Gunther, supra.*

It is incumbent upon the plaintiff to establish a prima facia case by a preponderance of credible evidence and this it failed to do except in the case of Shirey and Shifflet. There it presented such a wide and lengthy disparity of wages as to make it obvious that there was disparity between a male employee and female employee and in the time during which that occurred, it could have and should have been corrected, and therefore, it is a presumption that it failed to do so because one was a man, one was a woman. I can find no other reason for the disparity in pay which existed in this case. It was incumbent upon the defendant to show that it was not a matter of sexual discrimination, but one of oversight or other kind of negligence which would have had to be impressive to rebutt that of the plaintiff. The defendant failed to do so and, therefore, there was nothing for the plaintiff to combat, and the finding of disparity in wages between Shirey and Shifflet stands as a sex discrimination matter. There may be those who say that the evi-

dence is not strong enough, but if both were females or both were males and that occurred, such an argument would hold. It does not hold in the case where one is a male and one is a female. We are instructed by Congress to apply its law liberally and to evaluate it in such a way to correct the imbalance of a female pay violation.

With the reasonable and credible presentation of the evidence presented by the plaintiff for the fourth comparison and only the expert witness as a matter of rebuttal, the plaintiff did not offset the defense set forth by the defendant, in all otherwise. The only matter for my consideration here then is the remedy of the pay in the case of Shirey.

In the matter of burden of proof as it relates to Shirey, it will be seen that the burden has shifted and it was this burden that I have examined very carefully. For instance, when the question of sexual discrimination was rebutted by the defendant, I asked Shirey whether she felt that she was discriminated against on the basis of sex. Her answer was no. That would move into the defendant's rebuttal obligation and to that extent to satisfy some of the legal requirements in that connection which it did not do to overcome the clear proof by the plaintiff in its primary case when it showed the wide difference in salary between Shirey and Shifflet over a period of so many years. It may have been that the employee, Shirey, felt kindly toward her employer for giving her the promotions which it did. As a faithful employee at the present time it would have been to her disinterest to say that her employer was or had been discriminating against her because of sex and for that reason her answer can be expected to be defensive. Because the weight of the evidence in the plaintiff's case in the difference in pay was so great over such a long period of time and was not rebutted by her answer or otherwise by the defendant, I, therefore, hold that the plaintiff has assumed the burden and proved damages in the case of Shirey only and I shall award her benefits in damages to correct the inequality which has existed.

The evidence in connection with pay was not presented with sufficient clarification by the plaintiff, that in the event of an award for back pay, if called for, could have been arithmetically set forth by me, easily and legally. That should not have been difficult for the plaintiff to do, at least because the defendant was almost passive in that connection. And so, I have had difficulty in ascertaining the earnings of the various employees in the event of an award for damages for loss of pay if that had to be determined.

In plaintiff's exhibit 38, pg. 4, containing back pay calculations for Shirey, it appears from the way the columns are set up that Shifflet received $769.24 from the year 1984 through 1987. However, an inspection of exhibit 32, pg. 1, reveals that Shifflet made $769.24 every two weeks beginning on 02–02–81. Further examination of plaintiff's exhibit 38, pg. 4, reveals that Shifflet was manager of the Monroeville store from 02–02–81 to 06–12–84. Therefore, Shifflets beginning salary as manager of the Monroeville store in 1981 was higher than Shirey's salary at 04–30–87, the last pay period reported in exhibit 38 after three years of managerial experience. It is not clear from the evidence, particularly the exhibits, what Shifflet's prior experience was. Plaintiff's witness, Swesky, testified that Shifflet was hired because of his background and knowledge of the Pittsburgh market, but Swesky did not elaborate what this experience was. Shirey had extensive experience with Altmeyer's prior to being promoted to manager. Plaintiff's exhibit 28, pg. 6, reveals that Shirey was a stock person in 1976, and thereafter in various positions as a sales person, cashier, head cashier, manager trainee, assistant supervisor level 1, and finally she was promoted to manager of the Monroeville store in 1984. Prior to her promotion as manager in 1984, Shirey had 8 years' experience with Altmeyers. It is simply not credible that Shifflet had a greater breadth of experience to warrant a greater salary, particularly after Shirey worked an additional three years as manager of Monroeville, for a total of 11 years experience with Altmeyers.

It would be difficult to prove if there was a difference of pay for a short period of time that it was a matter of sex, but when it lasted as long as it did then it is believable that if Shirey had been a man it would not have lasted as long or would not have existed at all. Because Shirey was a woman and because of her own loyalty to the company, I conclude that the defendant knew and intentionally permitted the difference in pay for Shirey to exist and also took advantage of her as such. Accordingly, it would be an intentional violation of the Equal Pay Act and perhaps the Title VII Act that inequality in pay existed and that Shirey was deprived of equal pay because she was a woman.

As manager of Monroeville, her beginning salary is shown in exhibit 28 as $288.47 per week or $576.94 for a 2–week period. This figure matches the calculations contained on pg. 4 of exhibit 38 showing back pay calculations for Shirey for the period 07–14–84 to 03–08–86. On plaintiff's exhibit 28, Shirey is shown to have received an increase effective 02–24–86 which would make her new salary $317.31 weekly or $634.62 every two weeks as shown on pg. 4 of exhibit 38.

The salaries contained on pg. 4, plaintiff's exhibits 39 and 39A, were stipulated to by counsel and will be used to determine back pay calculations for Shirey for the years 1984, 1985 and part of 1986. However, "PAY INCREASE" Located directly below 1986 in the "year" column, the court notes that this increase and the salary differential were calculated for only *one* pay period:

PAY INCREASE

pe 3/8/86  364.62  769.24  134.52 × 1 pp = 134.62

Therefore, back pay calculations for the period beginning 3/8/86 until 4–30–87 will be taken from pg. 4 of plaintiff's exhibit 38. These figures do not differ from the amounts stipulated by counsel, but merely project the back pay to the present time.

From this date forth, any adjustments which should be made in accordance with this opinion will be made by the defendant to equalize Shirey's pay.

Back pay owed to Shirey is as follows:

| | 1984 | |
|---|---|---|
| Plaintiff's Exhibits 39 & 39A, pg. 4 | pe 7/14/84 to pe 12/15/84 | $ 2,267.64 |
| | 1985 | |
| Plaintiff's Exhibits 39 & 39A, pg. 4 | pe 12/29/84 to pe 12/14/85 | 4,999.80 |
| | 1986 | |
| Plaintiff's Exhibits 39 & 39A, pg. 4 | pe 12/28/85 to pe 2/22/86 | 961.50 |
| Plaintiff's Exhibit 38, pg. 4 | pe 3/8/86 to pe 12/29/86 | 2,961.64 |
| | 1987 | |
| Plaintiff's Exhibit 38, pg. 4 | to 4/30/87 | 1,211.58 |
| | | $12,402.16 |

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure 52.[1]

### ORDER OF COURT

AND NOW, TO–WIT, this 20th day of October, 1987, in accordance with the foregoing Opinion and Findings contained therein, judgment is hereby rendered in favor of the defendant in the claim of the plaintiff, EEOC, for inequality in pay and promotions for females as a class, generally, as against males, except in the claim for Patti Shirey, I find a case of discrimination which deprived her of the sum of $12,-402.16 and judgement is hereby rendered in favor of the plaintiff for that sum with interest from the date of this judgment.

1. Rule 52. Findings by the Court
   "(a) Effect. In all actions tried upon the facts without a jury … the court shall find the facts specially and state separately the conclusions of law thereon…. If an opinion or memorandum of decision is filed, it will be sufficient if the findings and conclusions of law appear therein."